IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

NO. 16-4589

---

UNITED STATES OF AMERICA,

Appellee,

v.

TAYLOR KING PEPE,

Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THE HONORABLE GEORGE LEVI RUSSELL, III,
(UNITED STATES DISTRICT JUDGE)

## BRIEF OF APPELLANT

RESPECTFULLY SUBMITTED,

JAMES WYDA
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF MARYLAND

JOANNA SILVER
PARESH PATEL
ASSISTANT FEDERAL PUBLIC
DEFENDERS
6411 IVY LANE, 7th FLOOR
GREENBELT, MARYLAND 20770
(301) 344-0600
joanna_silver@fd.org

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES.................................................................iii

JURISDICTIONAL STATEMENT .................................................... 1

ISSUES PRESENTED ........................................................................ 1

STATEMENT OF THE CASE............................................................ 2

I.    Procedural History.................................................................. 2

II.   The Offense............................................................................. 4

      A. The Stipulated Offense Conduct ...................................... 4

      B. Evidence Adduced at Sentencing.................................... 10

III. The District Court's Sentencing Findings ............................ 17

      A. The Role Adjustment ...................................................... 17

      B. The First-Degree Murder Cross-Reference .................... 20

SUMMARY OF ARGUMENT............................................................ 22

ARGUMENT ...................................................................................... 24

I.    The Parties Agree That After *United States v. Davis*, Mr. Pepe's conviction under 18 U.S.C. § 924(c) must be vacated because Hobbs Act conspiracy is not a "crime of violence," and he should be resentenced on the remaining count of conviction under the sentencing package doctrine............ 24

      A.      Standard of review........................................................ 24

      B.      Mr. Pepe's § 924(c) conviction is void because Hobbs Act conspiracy is not a "crime of violence.".................................... 25

i

C.   Mr. Pepe should be resentenced on his remaining Hobbs Act conspiracy conviction under the sentencing package doctrine ............... 26

II.   The District Court erred in concluding that Mr. Pepe was the leader or organizer of the robbery conspiracy. ..................................................... 28

A.   Standard of review  ..................................................... 28

B.   The district court should not have applied the role enhancement because Mr. Pepe exercised no more control over the conspiracy than its other three members. ..................................................... 28

1.   Mr. Pepe did not control Mr. Lewis ................................................ 29

2.   Mr. Pepe did not control Ms. McAdoo and Ms. Maready ........... 36

III.   The District Court erred in applying the first-degree murder cross-reference. ..................................................... 39

A.   The district court's conclusion that Mr. Pepe knew the gun was loaded is clearly erroneous. ..................................................... 41

B.   Without knowledge that the gun was loaded, Mr. Pepe did not possess the malice aforethought needed to apply the murder cross-reference. ..................................................... 44

CONCLUSION ..................................................... 48

STATEMENT REGARDING ORAL ARGUMENT ................................................. 49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

**PAGE**

## FEDERAL CASES

*Gardiner v. United States*, 114 F.3d 734 (8th Cir. 1997) ........................................................ 27

*Pepper v. United States*, 562 U.S. 476 (2011) ........................................................................ 27

*United States v. Ashford*, 718 F.3d 377 (4th Cir. 2013) ........................................................ 45

*United States v. Blake*, 81 F.3d 498 (4th Cir. 1996)2 ........................................................ 28

*United States v. Brown*, 879 F.3d 1231 (11th Cir. 2018) ........................................................ 28

*United States v. Cameron*, 573 F. 3d 179 (4th Cir. 2009) ........................................................ 30

*United States v. Celestine*, 510 F.2d 457 (9th Cir. 1975) ........................................................ 45

*United States v. Chaney*, 493 Fed. Appx. 448 (4th Cir. 2012) ........................................................ 46

*United States v. Ciavarella*, 716 F.3d 705 (3d Cir. 2013) ........................................................ 27

*United States* v. *Davis*, 139 S. Ct. 2319 (2019) ................................................................. *passim*

*United States v. Fleming*, 739 F. 2d 945 (4th Cir. 1984) ........................................................ 41

*United States v. Godette*, 596 Fed. Appx. 212 (4th Cir. 2015) ........................................................ 46

*United States v. Gotti*, 459 F. 3d 296 (2nd Cir. 2006) ........................................................ 37

*United States v. Jones,* 356 F. 3d 529 (4th Cir. 2004) ........................................................ 30

*United States* v. *Mathis*, 932 F.3d 242 (4th Cir. 2019) ........................................................ 24

*United States v. McClellan*, 436 Fed.Appx. 479 (6th Cir. 2009) ........................................................ 47

*United States v. McGregor*, 11 F.3d 1133 (2nd Cir. 1993) ........................................................ 36, 39

iii

*United States v. Phillips*, 287 F. 3d 1053 (11th Cir. 2002) .................................... 34

*United States* v. *Simms*, 914 F.3d 229 (4th Cir. 2019) (en banc) ................................. 22, 25

*United States v. Singh,* 54 F.3d 1182 (4th Cir.1995) ................................................ 28

*United States v. Slager*, 912 F.3d 224 (4th Cir. 2018) ............................................. 45, 48

*United States v. Stinson*, 97 F.3d 466 (11th Cir. 1996) ............................................. 27

*United States v. Ventura,* 864 F.3d 301 (4th Cir. 2017) ............................................ 26, 27

*United States v. Walker*, 191 Fed. Appx. 205 (4th Cir. 2006) ...................................... 30, 34

*United States v. Walker*, 934 F.3d 375 (4th Cir. 2019) ............................................. 27

*United States v. Weaver*, 716 F. 3d 439 (7th Cir. 2013) ............................................29, 30, 33

*United States v. Williams*, 342 F.3d 350 (4th Cir. 2003) ...........................................40, 45, 47

*United States v. Wright*, 594 F. 3d 259 (4th Cir. 2010) ........................................... 45

## **STATUTES**

18 U.S.C. §2 ...................................................................................... 2

18 U.S.C. §922(g)(8) ............................................................................. 2

18 U.S.C. § 924(c) ...........................................................................*passim*

18 U.S.C. §1111 ................................................................................ 40

18 U.S.C. §1951 ........................................................................... 1, 2, 22

18 U.S.C. § 3231 ................................................................................. 1

28 U.S.C. § 1291 ................................................................................. 1

<u>MISCELLANEOUS</u>

U.S.S.G. §2A1.1 ..............................................................................3, 22, 40

U.S.S.G. §2B3.1..................................................................................*passim*

http://news.bbc.co.uk/2/hi/8687002.stm ...................................................... 32

https://www.macmillandictionary.com/us/dictionary/american/turnt....................... 32

https://www.dictionary.com/e/slang/turnt/ .................................................... 32

Hootman, J.M. et. al, *National estimates of non-fatal firearm related injuries other than gunshot wounds*, 6 Injury Prevention 268 at 269-70 (2000) ................................................ 48

## JURISDICTIONAL STATEMENT

The District Court's jurisdiction over this case arose under 18 U.S.C. § 3231. That court entered a final judgment on July 21, 2016. J.A. at 521.[1] Mr. Pepe filed a timely notice of appeal on July 28, 2019. J.A at 527. This Court therefore has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

I.   Does conspiracy to commit Hobbs Act robbery under 18 U.S.C. § 1951(a) constitute a "crime of violence" under 18 U.S.C. § 924(c)?

II.  Desmick Lewis, Lauren Maready, Amanda McAdoo, and Taylor Pepe conspired to rob Russell Rowe, each exercising varying degrees of decision-making and control while fulfilling the object of the conspiracy. Did the District Court err when it applied a two-level leader/organizer role adjustment when calculating Mr. Pepe's sentence?

III. Desmick Lewis, Lauren Maready, Amanda McAdoo, and Taylor Pepe conspired to rob Russell Rowe by threatening or pistol-whipping him with an unloaded firearm. Did the District Court err when it applied the first-degree murder cross-reference to Mr. Pepe's sentence?

---

[1]J.A. refers to the Joint Appendix submitted by the parties.

1

## STATEMENT OF THE CASE

### I.     Procedural History

On January 15, 2015, the government charged Taylor Pepe, by indictment, with one count of Conspiracy to Interfere with Commerce Through Robbery, in violation of 18 U.S.C. §1951, and one count of Interference with Commerce Through Robbery, Aiding and Abetting, in violation of18 U.S.C. §1951 and 18 U.S.C. §2.   J.A. at 10.     On March 26, 2019, the government filed a superseding indictment, adding an additional count of Discharge of a Firearm During a Crime of Violence, Aiding and Abetting, in violation of 18 U.S.C. §924(c)(1)(A) and 18 U.S.C. §2.   J.A. at 13.   On September 16, 2015, the government filed a second superseding indictment, adding a fourth count of Possession of a Firearm by a Prohibited Person, Aiding and Abetting, in violation of 18 U.S.C. §922(g)(8) and 18 U.S.C. §2.   J.A. at 17.

On October 26, 2015, Mr. Pepe entered a plea of guilty to counts one and three of the second superseding indictment: Conspiracy to Interfere with Commerce Through Robbery, in violation of 18 U.S.C. §1951 and Discharge of a Firearm During a Crime of Violence, Aiding and Abetting, in violation of 18 U.S.C. §924(c)(1)(A) and 18 U.S.C. §2.   J.A. at 33-69.   The plea was entered pursuant to an agreement between Mr. Pepe and the government, entered on October 26, 2015.   J.A. at 22.

On July 21, 2016, the United States Probation Office filed a Presentence Report. J.A. at 528.    The report concluded that the base offense level was 43, based on the

2

application of a cross-reference from U.S.S.G. §2B3.1(c) (robbery) to the guideline for first-degree murder, U.S.S.G. §2A1.1. J.A. at 535. The report recommended an additional two-level upward adjustment pursuant to U.S.S.G. §3B1.1(c) based on the characterization of Mr. Pepe as an organizer or leader of the criminal activity. *Id.* The report deducted three-offense levels for Mr. Pepe's timely acceptance of responsibility, bringing the final offense level to 42. *Id.* Given a criminal history category of II, the report concluded that the guideline range for the Conspiracy count was 360 months to life. J.A. at 541. Because the maximum statutory penalty for Hobbs Act Robbery is 20 years in prison, the report modified the recommended range to a sentence of 20 years. *Id.*

The Presentence Report then indicated that the minimum term of imprisonment for Aiding and Abetting the Discharge of a Firearm in Connection With a Crime of Violence is 7-years, or 84 months, and the maximum term is life. *Id.* Thus, the report concluded that the final advisory guideline range was 20 years for the Hobbs Act Conspiracy and a consecutive 84 months to life for the 924(c) count. *Id.*

In early July, 2016, the parties submitted sentencing memoranda in which the government argued that the first-degree murder cross-reference and the role adjustment should apply and Mr. Pepe argued that they should not. J.A. at 544-703. On July 20, 2016, Mr. Pepe appeared for a sentencing hearing at which the district court heard testimony and accepted evidence regarding the cross-reference and the role adjustment.

3

J.A. at 70.    On July 21, 2016, Mr. Pepe appeared for a sentencing hearing at which the parties presented argument, and then the court made findings and imposed its sentence. J.A. at 389.    The court applied the cross-reference and the role adjustment, and then imposed a sentence of 20 years for the Hobbs Act Conspiracy and 15 years for the 924(c) count, to run consecutive, for a total sentence of 35 years in prison.   J.A. at 459.

On July 28, 2019, Mr. Pepe filed a notice of appeal.   J.A. at 527.

## II.    The Offense

### A.    The Stipulated Offense Conduct

As part of the plea agreement signed by Mr. Pepe and the government, the parties stipulated and agreed that the following facts are true and accurate and that the government would have proven them beyond a reasonable doubt at trial:

Taylor Pepe, age 21,[1] was a resident of Laurel, MD, Howard County.

On January 23, 2014 at approximately 9:57 pm, Howard County Police Department ("HCPD") officers were dispatched to a single vehicle collision in Laurel, Maryland.   A car had run into a tree.   Upon arrival, HCPD officers observed bullet holes in the driver's side window.   The driver, Russell Rowe, had been shot in the head multiple times.   Witnesses reported seeing a male (later identified as Desmick Lewis) and a female (later identified as Amanda McAdoo) standing outside the immediate area

---

[1] The age provided in the stipulated facts was Mr. Taylor's age at the time he entered the guilty plea.   On the date of the offense, Mr. Taylor was 19 years old. J.A. at 3.

4

where the collision had occurred before the two fled.  McAdoo has pleaded guilty in Howard County Circuit Court for her role in the crime.

HCPD officers recovered four Oxycodone pills in a clear plastic baggie and the victim's cell telephone inside the car.  Investigators recovered numerous text messages leading up to the time of the shooting between McAdoo's phone and Rowe's phone which reflected an arranged meeting to purchase the 4 Oxycodone pills from Rowe for $30 each.  The text messages also referenced a female named "Lauren" being with McAdoo. "Lauren" was later identified as Lauren Maready, an 18 year-old Howard county resident, who has pleaded guilty in Howard County Circuit Court for her role in the crime. The last texts between McAdoo and Rowe occurred at or about 9:42 pm and noted that McAdoo would be arriving in a Black Mercedes.  Maready's parents owned a Black Mercedes that Maready would drive.

Investigation revealed that on January 23, 2014, Maready and McAdoo went to Pepe's house.  Pepe lived with his mother on Sand Cherry Lane in Laurel, Maryland. The three (Maready, McAdoo and Pepe) went to a local Chipotle's for lunch.  The three discussed getting pills and McAdoo told Pepe that she knew that Rowe had pills to sell. Pepe told McAdoo to text whatever she needed to in order to get the pills.

At 4:11 pm., a text message was sent from McAdoo's phone to Rowe, stating, "Do you have any pain pills?"  At times, Pepe himself was using McAdoo's phone to community with Rowe, acting as if he were McAdoo.  Witnesses would testify that, at

5

some point in the afternoon, Pepe called Desmick Lewis.   Phone records reflect three calls between Pepe and Lewis at or about 2:51 pm., 3:13 pm., and 3:32 pm.   Lewis and Pepe were frequently together.

During the early evening hours the same day, Maready, McAdoo and Pepe bought some marijuana from a male friend ("the seller") living in the Fulton, Maryland area. The four friends smoked the marijuana and they dropped the seller off and went back to Pepe's home.   Phone records reflect a call from Lewis to Pepe at 7:25 pm.   Maready, McAdoo, and Pepe went to pick up Lewis around 8 p.m.   They all talked about a plan to rob Rowe for the pills rather than purchase the pills.   Witnesses would testify that Pepe said to Lewis, in sum or substance, "Show daddy what you can do and make me proud" and that Pepe was referring to the plan to rob Rowe.

After picking Lewis up, the four conspirators went to a local liquor store to purchase alcohol.   Lewis was the only one of age and he went inside the store to make the purchase.   The four then drove to Lewis' grandmother's house in Columbia, Maryland.   At some point inside the house, Lewis went to another area of the house and returned with a revolver.   The four co-conspirators then left in Maready's car to meet up with Rowe.   McAdoo continued to text message Rowe *en route*, lying to Rowe that she was only with Maready.

McAdoo and Rowe agreed on a meeting place.   Upon arrival, Lewis was told to get out and hide behind a fence.   At 9:43 p.m., Lewis texted McAdoo (whose number

6

he saved as "Amanda Pepe Gurl" in his phone a reference to the fact that McAdoo and Pepe were involved in a sexual relationship and had been for several months at this time). The message read: "Text me wen see his pulling or u rey hop the car." McAdoo then got out and slammed the door loud enough so Lewis could hear it and proceeded to Rowe's vehicle to talk to him.

At that point, Lewis approached the vehicle with his gun and fired several gunshots. Upon hearing the gunshots, Pepe and Maready drove away, leaving McAdoo and Lewis behind. McAdoo called Maready and said to meet at "her house," referring to McAdoo's grandmother's home on Park Avenue in Laurel, Maryland which was very close to where the shooting took place. The four conspirators met up again, and together the four drove north out of Howard County. Pepe told Maready to drive to a friend's house in Elkridge. According to the witnesses, Pepe was paranoid and collected everyone's cell phones. He had turned off his own phone prior to the robbery, last using it around 9:00 p.m.

At approximately 10:20 p.m., Pepe turned his phone on briefly to call a male friend who lived in a trailer park in Elkridge. The four showed up at the friend's trailer home soon thereafter. Only McAdoo and Pepe went inside the trailer. McAdoo, Pepe and the friend discussed the robbery/murder.

Still together, and still in Maready's car, the four co-conspirators left the trailer park around 11 to 11:30 that evening. Maready dropped Lewis, Pepe, and McAdoo at

7

Lewis' grandmother's house and then went home.

At Lewis' grandmother's house, several other men showed up and discussed the failed robbery and the shooting. Among them were Donte Powell and Avery Terry. The below photograph was posed on Instagram at approximately 12:18 a.m. we (sic) the comment: "Me and my man pepe, turnt". (Pepe is on left; Lewis on the right).[2]

Terry drove Pepe, Lewis, and McAdoo to Pepe's home around 3:00 a.m. The gun was also transported to Pepe's home.

The next morning, Maready joined Lewis, Pepe and McAdoo at Pepe's home on Sand Cherry Lane. The females had a pre-arranged ski trip to Pennsylvania and were preparing to leave. Pepe, Terry and others went to Maryland Live! Casino on Friday night, January 24, 2014.

Maready and McAdoo were arrested in Pennsylvania on Saturday, January 25, 2014. McAdoo text Pepe at approximately 3:23 p.m. with the news: "Getting arrested." HCPD officers arrested Pepe outside his home at approximately 3:15 p.m. and his cell phone was seized. No search was conducted of his home at that time. Lewis was hiding in a local hotel in Laurel.

On Sunday, January 26, 2014, at approximately 10:02 a.m., Lewis texted Terry a screen shot of Maryland Judiciary Case Search records reflecting that (sic) Pepe's arrest

---

[2]The referenced image can be viewed at J.A. at 342.

8

and the fact that he had been charged with attempted second degree murder. At the time the charges were placed, Rowe was legally brain dead but his organs were being harvested for science.

That same morning, Lewis went to Pepe's home, spoke to Pepe's mother, and went down to the basement alone to retrieve an item. At or about 2:08 p.m. on Sunday, January 26, 2014, Lewis text Avery Terry, "Son kal me it's important now". Terry and Lewis then met up and the two partied with some females at Lewis' grandmother's house in Columbia. At or about 4:15 p.m., Surveillance (sic) units had already set up a vantage point outside Lewis' grandmother's residence on Talisman Lane in Columbia, Maryland and, approximately one hour later, saw Lewis and Terry exit the home and get into Terry's car. Law enforcement officers saw Terry attempting to shield Lewis from view as they walked outside. Inside the car, Terry began to drive away, with Lewis in the passenger seat. Officers followed the vehicle and made a traffic stop at approximately 5:45 p.m. A black .38 caliber revolver was found under the driver's seat where Terry was driving. The gun that was observed in plain view, and was further identified as a Rohm GMBH, model 38S (38 special), .38 caliber revolver, serious number FF330415. Rowe was killed with a .38 caliber revolver.

Between January 21, 2014, and January 26, 2014, call detail records and other electronic evidence seized during the course of the three investigations reveal frequent and regular telephone communications between Desmick Lewis, Taylor Pepe, Avery

9

Terry and Donte Powell and other persons associated with all three (common contacts). J.A. at 30-32.

### B.    Evidence Adduced at Sentencing

Through witness testimony and exhibits submitted before and during sentencing, the parties presented the following information relevant to the contested guideline adjustment and cross-reference:

Lauren Maready and Amanda McAdoo were best friends at the time of the offense.   J.A. at 78.    The two girls would get high together, go shopping, hang out at Ms. Maready's home, and watch movies together. J.A. at 80.   In the months leading up to the offense, Ms. McAdoo was in a relationship with Mr. Pepe.  J.A. at 239.   Ms. McAdoo testified at sentencing that Mr. Pepe had hit her "a couple of times."   J.A. at 240.

Prior to the offense, Ms. McAdoo, Ms. Maready, Mr. Pepe, and Desmick Lewis spent a lot of time together.   J.A. at 82.   Whenever Ms. Maready would hang out with Ms. McAdoo and Mr. Taylor, Mr. Lewis "would usually be around" or the three would pick him up.   J.A. at 82-83.   Mr. Pepe and Mr. Lewis often went to the casino together; Mr. Lewis was over 21 and Mr. Pepe, who was 19, had a fake ID that allowed him to get into the casino.   J.A. at 86-87.   Because Mr. Lewis was over 21, he would also buy alcohol for Mr. Pepe, Ms. Maready, and Ms. McAdoo.   J.A. at 87.

Mr. Lewis and Mr. Pepe were good friends and Mr. Pepe often called Mr. Lewis

10

"son." J.A. at 87.  Mr. Pepe used the term "son" to refer to multiple people, including one of the witnesses at sentencing, Ms. McAdoo's brother, Christopher Morris. J.A. at 192.  Other men in their social circle used that term as well; Mr. Morris used it himself to address other friends and Mr. Lewis used it when he called Terry Avery two days after the robbery.  J.A. at 32, 160, 192-93.

On the date of the offense, it was Ms. McAdoo's idea to see if Russell Rowe had any pain pills.  J.A. at 93-94.  The two were friends and Ms. McAdoo told the police after the offense that Mr. Rowe "had the biggest crush on me." J.A. at 251.  Ms. Maready also knew Mr. Rowe, having been introduced to him by one of the people she bought cocaine from. J.A. at 94.  Mr. Pepe did not know Mr. Rowe at the time of the offense.  J.A. at 95.  Ms. Maready testified at sentencing that while Ms. McAdoo was texting Mr. Rowe to plan their meeting, Ms. Maready saw Mr. Pepe take the phone and type something into it just one time, and then Ms. McAdoo hit send. J.A. at 96.

At some point in the afternoon, Mr. Pepe called Mr. Lewis to see if he wanted to hang out.  J.A. at 206.  Ms. Maready believed that by this time, she, Ms. McAdoo, and Mr. Pepe knew, though "no one said out in the open" that they were going to rob Mr. Rowe for the pills, in part because they knew that none of them had money to buy them.  J.A. at 99-100.  Ms. Maready conceded that there were discussions prior to their meet up with Mr. Lewis about taking "everything" Mr. Rowe had. J.A. at 100. Specifically, she and Ms. McAdoo believed Mr. Rowe would bring all of his prescription

11

pills, his money, his weed, and his cocaine to the planned meeting.   J.A. at 100.

When Ms. Maready, Ms. McAdoo, and Mr. Pepe arrived at Mr. Lewis' home that day, Ms. McAdoo, Mr. Pepe, and Mr. Lewis began talking openly about the robbery. J.A. at 109.   When they talked about the robbery, the idea of "pistol-whipping" came up, but they said nothing about a shooting and nothing about a gun being loaded.   J.A. at 109.   Ms. Maready could not recall in her testimony who brought up the idea of pistol-whipping, despite being confronted with a statement she made to the police regarding Mr. Lewis being the one to suggest it.   J.A. at 110.

At some point, Mr. Pepe told Mr. Lewis to go upstairs and get either "my gun," or "the gun," or "my bitch." J.A. at 190-91.   Both men then played with the gun, with Mr. Lewis pointing it at Mr. Maready's head. J.A. at 111.   At that point, Ms. McAdoo asked Mr. Lewis if the gun was loaded and he said no.   J.A. at 185.   Ms. McAdoo then clarified with Mr. Pepe that the gun was not loaded and told both men that the gun should remain unloaded all night.   J.A. at 185.   While Ms. Maready could not remember the exact conversation, she remembered believing that the gun was unloaded. J.A. at 157-59.

The gun that was used to kill Mr. Rowe was a .38 caliber revolver.   J.A. at 32.   A black .38 caliber revolver was found in Mr. Lewis's possession at the time he was arrested several days after the robbery/murder.   J.A. at 585.   Ms. Maready testified that while she never saw Mr. Lewis "with" a gun prior to the date of the offense, she believed

12

he had a gun based on having seen a bag with a gun and crack inside of it that Mr. Lewis left in the backseat of her car.   J.A. at 89.   Ms. McAdoo testified that she had seen Mr. Lewis with a black .38 caliber revolver before the night of the offense.   J.A. at 259.   As a result, when Mr. Lewis came downstairs in his own house holding a black revolver, she was not surprised.   J.A. at 261.   Ms. McAdoo testified further that she believed the gun Mr. Lewis had on the night of the offense was his own, not Mr. Pepe's.   J.A. at 259.   Christopher Morris testified that he knew Mr. Pepe owned a gun, that he had seen it on Mr. Pepe's nightstand, and that this gun was a silver handgun.   J.A. at 176-77.

After confirming that the gun would be unloaded, Ms. McAdoo, Mr. Pepe, and Mr. Lewis talked about how they were going to surprise Mr. Rowe.   J.A. at 113.   Ms. McAdoo said she knew Mr. Rowe did not like cigarettes in his car, so she was going to smoke a cigarette so he wouldn't let her into his car, and then Mr. Lewis would run up to the side of the car with the gun. J.A. at 113.   Ms. McAdoo testified at the sentencing hearing that she had come up with a lot of good ideas in planning the robbery.   J.A. at 253.   For example, Ms. McAdoo decided where to meet Mr. Rowe, at a place that was familiar to both of them.   J.A. at 212.

When the group arrived at that meeting point, someone – no one remembered who – told Mr. Lewis to get out of the car.   J.A. at 31, 117.   At some point, either while the men were in the car or earlier that evening, Mr. Pepe had said to Mr. Lewis,

13

"you can do this, you got this, make Daddy proud." J.A. at 113.    Mr. Pepe had used the

term "Daddy," with Mr. Lewis in the past, "when they were being funny."    J.A. at 114.

After Mr. Lewis left the car, the women watched him walking down the road,

appearing drunk - tipsy and wobbling – and traveling past the meeting point. J.A. at 117.

Ms. McAdoo texted Mr. Lewis to tell him that he was going too far and then she

instructed him to come out from behind the fence when he heard her car door slam.

J.A. at 117.    It was Ms. McAdoo's idea to use the door slam as the signal that Mr. Rowe

had arrived.    J.A. at 153.    Without further instruction, Mr. Lewis went to hide behind

a fence. J.A. at 117.    Ms. McAdoo then told Mr. Pepe to hide in the back seat of the

car while they waited because Mr. Rowe was only expecting her and Ms. Maready.    J.A.

at 154-55.

Once Mr. Rowe arrived, Ms. Maready saw Ms. McAdoo go up to the car and then

saw Mr. Lewis push Ms. McAdoo out of the way and put a gun to Mr. Rowe's head.

J.A. at 117.    As Mr. Rowe started to flail his arms and turn away, Ms. Maready heard

four shots and saw Mr. Rowe's car drive into the yard of a near-by house.    J.A. at 117.

After the shooting, when the four friends met up again, Mr. Pepe and Ms.

McAdoo were angry with Mr. Lewis for shooting Mr. Rowe.    J.A. at 163.    They said,

"you were just supposed to pistol-whip him."    J.A. at 163.    Ms. McAdoo was stunned

and shocked because she believed the gun had been unloaded.    J.A. at 254.    Mr. Pepe

was also shocked and was acting "paranoid," ordering everyone to give him their

14

phones. J.A. at 193. It was normal for Mr. Pepe to be worried about phones and to ask people to turn them off. J.A. at 180.

The group then drove to another friend's home, and while Ms. McAdoo and Mr. Pepe were inside, Ms. Maready and Mr. Lewis remained in the car. J.A. at 122. While waiting, Ms. Maready observed Mr. Lewis counting the bullets remaining in his gun and heard him calmly say that he, "had knocked four off." J.A. at 122.

Later that evening, everyone but Ms. Maready went back to Mr. Lewis's house, where several other men came to hang out with them. J.A. at 226-27. All of the men were talking about the robbery, joking, and passing the gun around. J.A. at 227-28. The group then moved to Mr. Pepe's house to sleep for the night and Mr. Lewis kept the gun. J.A. at 232-35. The next day, Ms. Maready and Ms. McAdoo went to a ski resort in Pennsylvania with Ms. Maready's family. J.A. at 127. While there, the women partied together, drinking alcohol, smoking weed, and taking pictures of each other. J.A. at 57-72, 128.

Ms. McAdoo and Ms. Maready both testified that prior to the offense, they frequently tried to get drugs for free and were always scheming to get their next fix. J.A. at 140-42. Ms. Maready shared an example of a time that Ms. McAdoo ripped off one of her drug dealers, and Ms. McAdoo testified that this was not the only time she had done this. J.A. at 140, 250. Submitted in evidence was an extraction report from Ms. McAdoo's phone containing notes she made on January 12, 2014, approximately

15

10 days before this offense. J.A. at 263, 603. The notes contain a list of goals for the day which were: 1) Eat breakfast; 2) sell pills; 3) Rob someone; 4) Find jobs; and 5) Get drunk. J.A. at 263, 603.

At the time of the offense, Mr. Pepe had no prior criminal convictions but was awaiting trial on charges of assault in the second degree and false imprisonment based on a domestic violence incident between him a woman he had been in a relationship with prior to Ms. McAdoo. J.A. at 536-37. Mr. Pepe was convicted of that offense by the date of sentencing in the instant case. J.A. at 536-37. Mr. Lewis had two prior convictions for theft, each of which arose from cases in which he had originally been charged with burglary. J.A. at 277-78, 623-26. In addition, the parties stipulated that Mr. Lewis had been identified by witnesses in a sexual assault case as one of several men who had participated in the gang rape of a young woman. J.A. at 277-78. And, the parties both introduced evidence in the form of wiretap transcripts showing that both Mr. Lewis and Mr. Pepe had relationships with known members of the Bloods gang in Howard County. J.A. at 604-617.

An agreed statement of facts submitted in support of Desmick Lewis' guilty plea for the murder of Russell Rowe in the Howard County Circuit Court concludes as follows: "In sum, throughout the day and evening of January 23, 2014, Amanda McAdoo, Lauren Maready, Desmick Lewis, and Taylor Pepe all planned and conspired to lure Rusty Rowe to Sewell Avenue to rob him. They conspired and planned to rob

16

Rusty by striking him with a .38 caliber revolver.   When Rusty Rowe arrived on Sewall Avenue, Amanda McAdoo approached Rusty's vehicle from the passenger side.   Rusty remained seated in the driver's seat.   Desmick Lewis approached the passenger side and moved Amanda McAdoo out of the way.   Defendant leaned into Rusty's truck, placed the revolver against Rusty's head.   Rusty reacted by trying to push or swat the gun away and this Defendant fired several gunshots.   Those gunshots killed Rusty Rowe."   J.A. at 574-80.

## III.   The District Court's Sentencing Findings

### A.      The Role Adjustment

The parties began their arguments at sentencing by addressing the first-degree murder cross-reference.   J.A. at 395.   During that discussion, counsel for Mr. Pepe argued that Mr. Pepe did not know the firearm was loaded at the time of the robbery. J.A. at 404-05.   The court interrupted this argument to ask the parties to address the leader/organizer role adjustment, stating,

> . . . I think one of the Court's inquiries is going to be if I find that Mr. Pepe was an organizer or leader of this enterprise, at least over the two young ladies . . . and potentially over Mr. Lewis, then can I impute some knowledge into the loading of that firearm to the leader of the criminal enterprise or the conspiracy?

> So of course, if he was not a leader, then I could not factor that in. But of course, if I find that he was a leader or an organizer in the conspiracy, then I believe based upon the testimony that I received from Ms. McAdoo and Lauren Maready in the post-shooting behavior of the defendant, that could suggest, at least circumstantially, that he knew that

17

the gun was loaded, they had the opportunity to observe the gun being loaded, and therefore the cross-reference would apply, because he would have had awareness and a serious risk of death of (*sic*) bodily harm.

. . . I'm thinking that the two are so intertwined that it may be better for me to consider all of those factors, and maybe that's why I should have started with role.

J.A. at 404-05.

The parties then addressed the role adjustment. During that discussion, the court made a number of observations and factual findings. First, the court said that Mr. Pepe "recruited" Mr. Lewis. J.A. at 410. The following colloquy ensued with counsel for Mr. Pepe,

> MS. WHALEN: "But he was with him constantly. The girls say they were together all the time. They also say that the four of them were together doing things, using drugs, drinking, which is what they were also doing.
> THE COURT: He could have stopped it as well, if I believe Miss McAdoo and Lauren Maready.
> MS. WHALEN: And I suggest, Your Honor, that Miss. McAdoo and Miss Maready could have stopped it just as well.
> THE COURT: They could have. They could have stopped.

J.A. at 410-11.

Counsel for Mr. Pepe and the court then had the following exchange regarding Mr. Pepe's control over Ms. McAdoo that evening:

> THE COURT: Do you think Mr. Pepe considered himself an equal to Ms. McAdoo?
> MS. WHALEN: I don't know what Mr. Pepe considered himself.
> THE COURT: I mean, he slaps her around. He thinks he's an equal to women. He dots women's eyes who are his girlfriends, he thinks –and that seems to suggest that he actually thinks he's equal to her.

18

> MS. WHALEN: I'm not saying that the test is equal. What I'm saying –
> THE COURT: No.
> MS. WHALEN: --is to exert control over the players.   And even if in his
> mind he thought he was stronger than her, or in their particular
> relationship, which I'd suggest to you is a relationship she was in willingly,
> not that that means anything.
> THE COURT: No.   It doesn't mean anything, because it was classic
> battered women syndrome right here that I saw. . . .
> MS. WHALEN: Yes. She indicates that my client hit her and pushed her,
> or slapped her and pushed her.   And I'm not saying that that didn't
> happen. What I'm saying is, that doesn't mean he had control over the
> participants in this case.   She herself said she planned this.   She was the
> one that came up with all of the ideas, because she wanted drugs.

J.A. at 416-17.

After counsel for Mr. Pepe completed her argument, the court concluded that

Mr. Pepe was a leader/organizer and that the role adjustment should apply.   J.A. at 418.

The court made the following factual findings in support of its conclusion.   The court

found that Mr. Pepe brought Mr. Lewis into the conspiracy to commit robbery and that

he instructed Mr. Lewis to get the firearm that Mr. Lewis used in the robbery.   *Id.*   The

court found that Mr. Pepe had the ability to stop Mr. Lewis from participating in the

robbery and that Mr. Pepe "exercised a dominant position with regard to Lauren

Maready and Miss McAdoo." *Id.*   However, the court also concluded that "it's very

clear that they were part of this as well, and certainly willingly participated." *Id.*   The

court went on to find that Mr. Pepe exercised control over the girls by "confiscation of

their personal property, through the direction where they were going to go and why

they were going where they were going, and how long they were going to stay." *Id.*

19

The court then stated that the picture submitted by the government of Mr. Pepe and Mr. Lewis standing together after the robbery "is an indication of the defendant's role in this." *Id.*

The court went on to conclude that Mr. Lewis' role was as one of the "bad boys, so to speak, to put the muscle behind the scheme" and that while "it may have been Ms. McAdoo's original idea to get narcotics, Mr. Pepe clearly took over as the operational arm of this conspiracy." J.A. at 419.

### B.  The First-Degree Murder Cross-Reference

Prior to its pivot towards a consideration of the role adjustment, the district court heard argument from the parties regarding the contested cross-reference. The court and counsel for Mr. Pepe engaged in a discussion regarding whether agreeing to commit a robbery by pistol-whipping would be sufficient to create the malice aforethought required for the cross-reference to apply, assuming there were no bullets in the gun. J.A. at 401-02. It was at this point that the court raised the above-discussed question of how and whether it could determine that Mr. Pepe knew the gun Mr. Lewis used was loaded, despite Ms. McAdoo and Ms. Maready's belief that it was not. J.A. at 402.

After making its finding on the role adjustment, the court returned to this point, and concluded that the cross-reference applied. J.A. at 419. The court then made the following statement regarding Mr. Pepe's knowledge and the application of the cross-reference:

20

. . . I think the cross-reference applies as well, not only based upon the defendant's role and the implication of that role being that Mr. Lewis – there was a loaded gun that was fired, and that the gun went from being unloaded to loaded at some time prior to the murder.

The easy assumption would be that Mr. Lewis knew that the gun was loaded, because, after all, numerous shots were fired. But certainly the defendant's location in the back of the vehicle, his role in the conspiracy, which is supported by his subsequent conduct after the conspiracy in the case, all support the evidence that the defendant was aware of the serious risk of death or bodily injury.

*Id.*

The court went on to conclude that even if Mr. Pepe did not know the gun was loaded, he knew, "that Mr. Lewis was going to use the weapon at the very least to inflict bodily harm on the defendant . . . by pistol-whipping him." *Id.* The court found that pistol-whipping can "easily" result in someone being killed, "depending on the location and the strength of the blows." J.A. at 420. Moreover, the court concluded that even if Mr. Pepe was not aware that there would be a pistol-whipping, or even if pistol-whipping did not create a serious risk of death or bodily injury, "knowingly having Mr. Lewis carry a firearm to commit a robbery in and of itself creates a serious risk of death or bodily harm." *Id.* Lastly, the court rejected the argument that Mr. Lewis himself did not possess the sufficient *mens rea* to be guilty of murder because he was so heavily intoxicated. *Id.*

21

## SUMMARY OF ARGUMENT

The parties agree that Mr. Pepe's conviction under 18 U.S.C. § 924(c) for use of a firearm during and in relation to a "crime of violence" must be vacated. The parties disagree regarding the correct offense level for the remaining conviction under 18 U.S.C. § 1951(a), conspiracy to commit Hobbs Act robbery.

The residual clause of § 924(c)(3)(B), defining a "crime of violence," is unconstitutionally vague, as the Supreme Court recently held in *United States* v. *Davis*, 139 S. Ct. 2319, 2336 (2019). The predicate crime here, conspiracy to commit Hobbs Act robbery under 18 U.S.C. § 1951(a), does not constitute a "crime of violence" under the surviving force clause of § 924(c)(3)(A), as this Court recently held in *United States* v. *Simms*, 914 F.3d 229, 233 (4th Cir. 2019) (en banc). Accordingly, the "crime of violence" element cannot be satisfied and Mr. Pepe's § 924(c) conviction is void.

Once this Court vacates the 924(c) count, Mr. Pepe's case must be remanded for resentencing on the remaining count of conviction for Hobbs Act conspiracy under the sentencing package doctrine. Upon resentencing, however, the district court should not apply the two-level upward role adjustment pursuant to §3B1.1(c) or the first-degree murder cross-reference pursuant to §§2B3.1(c) and 2A1.1.

The role adjustment guideline and the cases that have interpreted it make clear that the adjustment's goal is to address the relative culpability of the various members of a criminal enterprise. An examination of the facts leading up to the robbery and

22

murder reveal that Taylor Pepe was no more culpable than Desmick Lewis, Lauren Maready, or Amanda McAdoo.

The robbery conspiracy was not a sophisticated criminal enterprise with Mr. Pepe at the helm; it was a day-of decision by a group of friends to do whatever they needed to get their next fix. Various members of the group exercised control at various times and contributed in various ways to fulfilling the object of the conspiracy. While Mr. Pepe may have had a controlling relationship with his girlfriend, and may have been admired by Desmick Lewis, he did not control their actions at the time of the offense.

In deciding that Mr. Pepe's conduct warrants a role adjustment, the district court relied on several factual conclusions that are clearly erroneous. The court repeated this error when addressing the murder cross-reference. Specifically, the court ignored the evidence in the record and concluded that Mr. Pepe's leadership role allowed the court to infer that Mr. Pepe knew Desmick Lewis loaded his gun before killing Russell Rowe. As a result, the court concluded that Mr. Pepe possessed the malice aforethought necessary to make him liable for Mr. Rowe's murder.

Assuming this Court agrees that Mr. Pepe played a leadership role in this conspiracy, the record does not support a conclusion that Mr. Pepe knew the firearm was loaded. If, as the record strongly suggests, he did not know the firearm was loaded, then he did not act with malice aforethought and the district court should not have

23

applied the first-degree murder cross-reference.

Common-sense and available data, combined with an absence of cases applying the cross-reference to crimes committed with an unloaded firearm, indicate that Mr. Pepe would not have been aware that the object of this conspiracy carried with it a serious risk of death or serious bodily harm if he believed the firearm was unloaded. Without this awareness, there is no malice, and the cross-reference should not have been applied. Upon remand for resentencing, the district court should sentence Mr. Pepe pursuant to the standard robbery guideline.

## ARGUMENT

I. **The Parties Agree That After *United States v. Davis*, Mr. Pepe's conviction under 18 U.S.C. § 924(c) must be vacated because Hobbs Act conspiracy is not a "crime of violence," and he should be resentenced on the remaining count of conviction under the sentencing package doctrine.**

### A.     Standard of review

This Court reviews *de novo* the question whether particular offense qualifies as a crime of violence under 18 U.S.C. § 924(c). *See United States* v. *Mathis*, 932 F.3d 242, 263 (4th Cir. 2019).

### B.     Mr. Pepe's § 924(c) conviction is void because Hobbs Act conspiracy is not a "crime of violence."

Mr. Pepe's § 924(c) conviction for using a firearm during and in relation to a "crime of violence" is void because the "crime of violence" element cannot be satisfied here. The predicate offense of Hobbs Act conspiracy does not qualify as a "crime of

24

violence" as a matter of law.

Under § 924(c)(3), "crime of violence" is defined as follows:

(3)     For purposes of this subsection, the term "crime of violence" means an
        offense that is a felony and –

    (A)     has an element the use, attempted use, or threatened use of physical
            force against the person or property of another, or

    (B)     that by its nature, involves a substantial risk that physical force
            against the person or property of another may be used in the course
            of committing the offense.

The first clause – § 924(c)(3)(A) – is the force clause.   The other – § 924(c)(3)(B)

– is the residual clause.   Because the Supreme Court in *Davis,* 139 S. Ct. at 2336, held

that the § 924(c) residual clause is unconstitutionally vague in violation of the Due

Process Clause, Mr. Pepe's § 924(c) conviction cannot be sustained under the § 924(c)

residual clause.

Likewise, a Hobbs Act conspiracy is not a "crime of violence" under the

remaining force clause (§ 924(c)(3)(A)).   Indeed, the Fourth Circuit held exactly as such

in *Simms,* 914 F.3d at 233-34, because conspiracy requires the government to "prove

only that the defendant agreed with another to commit actions, which if realized would

violate [the object of the conspiracy].   Such an agreement does not invariably require

the actual, attempted, or threatened use of physical force."   *Id.* at 233-34.

In sum, Mr. Pepe's § 924(c) conviction is void because the "crime of violence"

element cannot be satisfied.   Therefore, the conviction must be vacated, and Mr. Pepe

must be resentenced on his remaining count of conviction for Hobbs Act conspiracy

25

under the sentencing package doctrine.

### C. Mr. Pepe should be resentenced on his remaining Hobbs Act conspiracy conviction under the sentencing package doctrine.

When one count informing a multi-count sentence is invalidated after a successful challenge on appeal, the sentencing package doctrine applies. Under "the sentencing package doctrine," the only appropriate option when faced with the invalidation of one count, but less than all counts of a multi-count conviction, is to order a new sentencing hearing on the remaining counts. *See Davis*, 139 S. Ct. at 2336 ("when a defendant's §924(c) conviction is invalidated, courts of appeals routinely vacate the defendant's entire sentence on all counts" so that the district court may resentence on the remaining counts of conviction) (internal citation and quotations omitted); *United States v. Ventura,* 864 F.3d 301, 309 (4th Cir. 2017) ("reassert[ing] [the Fourth Circuit's] adoption of the sentencing package doctrine").

The sentencing package doctrine recognizes that "a criminal sentence is a package of sanctions that the district court utilizes to effectuate its sentencing intent." *Pepper v. United States*, 562 U.S. 476, 507 (2011) (quoting *United States v. Stinson*, 97 F.3d 466, 469 (11th Cir. 1996) (per curium)). Under this doctrine, "an attack on one count [of a multiple-count sentence] is an attack on the 'bottom line' sentence and warrants resentencing on all counts." *Gardiner v. United States*, 114 F.3d 734, 736-37 (8th Cir. 1997); *see also Ventura*, 864 F.3d at 309 (holding that the district court properly

26

resentenced the defendant after the invalidation of a § 924(c) conviction).

Accordingly, when an "interdependent" component of an aggregate sentence is vacated, "[r]esentencing on all counts is warranted," and courts "unbundle" the multicount sentencing package and resentence the defendant "*de novo*." *United States v. Ciavarella*, 716 F.3d 705, 734 (3d Cir. 2013)). That is now what happens as a matter of course when a Section 924(c) conviction is invalidated and other counts of conviction are affirmed. *See, e.g., Davis*, 139 S. Ct. at 2336; *Ventura*, 864 F.3d at 309; *United States v. Walker*, 934 F.3d 375, 380 (4th Cir. 2019).

Sentencing packaging doctrine cases—and, in particular, cases that have required resentencing following the invalidation of § 924(c) convictions—confirm that the proper result in this case is a new sentencing hearing. The doctrine acknowledges that a criminal sentence is a holistic determination that accounts for all of the relevant evidence and each offense of conviction. *Ventura*, 864 F.3d at 309 ("The sentencing package doctrine accounts for the holistic approach that a district court should employ when sentencing a defendant convicted of multiple offenses."); *United States v. Brown*, 879 F.3d 1231, 1239 (11th Cir. 2018) ("If there is a chance that the erroneous sentence on one count of conviction influenced the sentencing judge's decisions on other counts, then merely excising the mistaken sentence for one count won't put the defendant in the same position as if no error had been made.").

Applying this doctrine here, with the vacatur of Mr. Pepe's § 924(c) conviction

27

and sentence, the sentencing package on both counts of conviction has been unbundled. Therefore, with the agreement of both parties, this Court should vacate Mr. Pepe's sentence on both counts of conviction and remand this case for a resentencing on the remaining Hobbs Act conspiracy conviction.

## II.    The District Court erred in concluding that Mr. Pepe was the leader or organizer of the robbery conspiracy.

### A.    Standard of review

In reviewing the application of the guidelines by a district court, this Court determines factual determinations for clear error and legal questions *de novo*. *See United States v. Blake*, 81 F.3d 498, 503 (4th Cir. 1996), citing, *United States v. Singh,* 54 F.3d 1182, 1190 (4th Cir.1995).

### B.    The district court should not have applied the role enhancement because Mr. Pepe exercised no more control over the conspiracy than its other members.

U.S.S.G. §3B1.1 sets forth seven factors for courts to consider when deciding if a defendant acted as a leader or organizer of a criminal enterprise. They include: 1) the exercise of decision making authority; 2) the nature of participation in the commission of the offense; 3) the recruitment of accomplices; 4) the claimed right to a larger share of the fruits of the crime; 5) the degree of participation in planning or organizing the offense; 6) the nature and scope of the illegal activity; and 7) the degree of control and authority exercised over others. U.S.S.G. §3B1.1, App. Note 4. Courts must apply this

28

against the "Background" set forth in the guideline, which indicates that the adjustment is included "primarily because of concerns about relative responsibility." *Id; see also*, *United States v. Weaver*, 716 F. 3d 439 (7th Cir. 2013) ("[A]t the base of the rationale for this enhancement sits the relative culpability of each participant in the criminal enterprise. . . in short, relative culpability is a 'central concern' of Guideline 3B1.1."), internal quotation omitted.

An application of the guideline factors, set against the background of the "relative culpability" rationale, leads to the conclusion that Mr. Pepe was not a leader or organizer of the robbery that resulted in the death of Russell Rowe.   Multiple factual findings upon which the district court relied in applying the adjustment were clearly erroneous and the remaining facts paint a picture of a conspiracy in which the members exercised varying degrees of control and authority at varying times, with no one person exercising greater control than any other.

### 1.     Mr. Pepe did not control Mr. Lewis.

The court erroneously concluded that Mr. Pepe brought Mr. Lewis into the conspiracy and then relied heavily on this recruitment as evidence of Mr. Pepe's leadership role.   While recruiting members of a conspiracy can be indicia of a leadership role, the record does not support the conclusion that Mr. Pepe recruited Mr. Lewis.   *See, e.g., United States v. Jones,* 356 F. 3d 529, 538 (4th Cir. 2004) (enhancement applied where, among other things, defendant recruited drug dealers); *United States v.*

29

*Walker*, 191 Fed. Appx. 205, 208 (4th Cir. 2006) (enhancement applied where, among other things, defendant approached one co-conspirator and asked him to help steal the car to be used in the robbery and asked another to contact a third party to arrange a meeting); *Cf.*, *Weaver*, 716 F. 3d at 442-445 (enhancement not applied where defendant aggressively sold his drugs and encouraged his dealers to pay him promptly but was not actively engaged in the recruitment of other distributors); *United States v. Cameron*, 573 F. 3d 179, 185 (4th Cir. 2009) (enhancement not applied where defendant played an integral role as the manufacturer of counterfeit bills but did not recruit accomplices into the operation).

In the agreed statement of facts submitted in support of Mr. Pepe's plea agreement, the parties stipulated that Desmick Lewis and Taylor Pepe were frequently together. J.A. at 30. The statement of facts includes no admission of recruitment, no suggestion that Mr. Pepe called Mr. Lewis on the date of the offense for the purpose of involving him in the robbery, and no indication that anyone told Mr. Lewis about the robbery until after all four co-conspirators were hanging out together. J.A. at 30-32. While the statement of facts includes the statements "show daddy what you can do," and "make me proud," testimony at the sentencing hearing revealed that Mr. Pepe made these statements in an act of encouragement, not an attempt to recruit Mr. Lewis to participate in a conspiracy that he had already agreed to join. J.A. at 113.

Testimony at the sentencing hearing also revealed that it was a common

30

occurrence for all four of the co-conspirators to be together and that Mr. Lewis'
involvement in the conspiracy was not the result of an intentional solicitation beyond
what these friends would normally do in order to engage in any activity together.   The
two men were good friends and often went to the casino together.   J.A. at 86-87.   Ms.
Maready testified that whenever she hung out with Mr. Pepe and Amanda McAdoo, Mr.
Taylor would "usually be around, or we'd go pick [him] up . . ."   J.A. at 82-83.

Additionally, Ms. McAdoo testified that Mr. Pepe called Mr. Lewis on the date
of the offense to see if he wanted to "just hang out."   J.A. at 206.   While there were
discussions of the robbery prior to that call, no one testified that Mr. Pepe called Mr.
Lewis for the purpose of bringing him into the robbery, and no one testified that Mr.
Pepe ever asked Mr. Lewis to participate in the robbery.   J.A. at 100.   The record
reveals only that friends who typically hung out together, were again choosing to do so.
Moreover, as evidenced by the notes found in Ms. McAdoo's phone, robbing someone
may not have been an unusual plan for this group of friends to have on their agenda.
J.A. at 263, 603.   Given all of this, inviting Mr. Lewis to hang out with them on the day
of this robbery did not amount to a recruitment effort by Mr. Pepe.

The district court's conclusion that a picture of Mr. Pepe and Mr. Lewis taken
after the robbery "is an indication of the defendant's [leadership] role in this" is also
clearly erroneous. J.A. at 418.   The picture shows Mr. Pepe and Mr. Lewis standing next
to each other with Mr. Lewis holding his hand in a gesture in which his index and pinkie

31

fingers are extended.   J.A. at 342.    This gesture has many popular meanings, though none appear to be a sign of subservience or anything else that might indicate that Mr. Lewis        was        being        deferential        to        Mr.        Pepe.        *See* http://news.bbc.co.uk/2/hi/8687002.stm,   last   accessed   November   27,   2019. Moreover, it was Mr. Lewis who posted the picture on his Instagram account with the caption, "me and my man pepe, turnt." J.A. at 31.    "Turnt," is slang for excited or having    a    good    time,    often    with    drugs    or    alcohol.    *See, e.g.,* https://www.macmillandictionary.com/us/dictionary/american/turnt,   last   accessed November   27,   2019;   https://www.dictionary.com/e/slang/turnt/,   last   access November 27, 2019.

Nothing in this picture indicates that Mr. Pepe had a dominant role visa vi Mr. Lewis.   If anything, the picture indicates an equal relationship in which the two men, having just engaged in a robbery, and Mr. Lewis, having just shot someone in the head, were having fun and partying together.   It may be an offensive image, but it is clearly erroneous for the district court to have concluded that it supports a finding that Mr. Pepe was a leader or organizer of the conspiracy.

Similarly, the record does not support the district court's conclusion that Mr. Pepe could have stopped Mr. Lewis from participating in the robbery or that the ability to stop him suggests that Mr. Pepe had "control" over him, as required by the role adjustment.   J.A. at 418.   First, the court acknowledged that any one of the three co-

32

conspirators could have stopped Mr. Lewis from committing the robbery.   J.A. at 410-

11.   Second, words of encouragement such as "you can do this, make Daddy proud"

are not the same as control and leadership.   J.A. at 44;   *Cf. Weaver*, 716 F. 3d at 441-445

(exerting pressure on a drug customer to re-sell the product quickly, even where the

customer changed his behavior in response, was not sufficient to show evidence of a

controlling relationship).

Nor was it reasonable, given the evidence, for the district court to have relied on

Mr. Pepe's use of the words "daddy" or "son" with Mr. Lewis to support a conclusion

that Mr. Pepe controlled him.   The record is replete with evidence that these words

were part of the common parlance in the social circles in which Mr. Pepe and Mr. Lewis

moved.   Witnesses testified that Mr. Pepe used the term "son" to refer to multiple

people, including Christopher Morris, one of the government's witnesses.   J.A. at 160-

61; 192.   Moreover, Mr. Morris himself used the phrase, as did other male friends of

theirs. J.A. at 192-93.   In fact, the stipulated statement of facts reveals that Mr. Lewis

used the term "son" to address another man, Avery Terry, when Mr. Lewis was seeking

his assistance in the days after the robbery.   J.A. at 32.

While the record does support a factual conclusion that Mr. Pepe told Mr. Lewis

to get "his gun," or "the gun," or "my bitch," this does not support a legal conclusion

that Mr. Pepe had any more control over the conspiracy than Mr. Lewis.   J.A. at 259-

260.   The gun came from Mr. Lewis' house; it was a gun already in Mr. Lewis'

possession and a gun that appeared similar to one that Ms. McAdoo had seen in a bag belonging to Mr. Lewis in the past.   J.A. at 259.   *Cf. United States v. Phillips*, 287 F. 3d 1053, 1058 (11th Cir. 2002) (supplying guns used in a robbery supported the organizer/leader enhancement); *Walker*, 191 Fed. Appx. at 208 (supplying firearm and ammunition used in a carjacking supported organizer/leader enhancement).   As a result, Ms. McAdoo assumed that the gun, which Mr. Lewis jokingly pointed at Ms. Maready's head, belonged to Mr. Lewis and not to Mr. Pepe.   J. A. at 42, 259.   Ms. McAdoo's belief that the black handgun used in the robbery belonged to Mr. Lewis was supported by Christopher Morris' testimony that the only gun he had ever seen in Mr. Pepe's possession before was silver in color.   J.A. at 194.

As will be discussed in greater detail below, the district court's decision to infer that Mr. Pepe knew the gun was loaded is particularly problematic, and clearly erroneous.   In a classic example of the tail-wagging the dog, the court concluded that if Mr. Pepe was a leader or organizer of this conspiracy, it followed that he would have known the gun was loaded, knowledge which the court could use against him in applying the murder cross-reference. J.A. at 404-05.   On the other hand, the court concluded, if it found that Mr. Pepe was not a leader or organizer, it could not impute knowledge of the firearm being loaded to him.   *Id.*   This reasoning acknowledges that there is no direct evidence in the record to support a conclusion that Mr. Pepe knew the gun was loaded; the conclusion could only come by imputing this knowledge.

34

However, lost in the court's reasoning is the contrary fact that if Mr. Pepe did not know the gun was loaded, it is less likely that he was a leader organizer. On the record before this Court, this is the only reasonable conclusion to make – as will be discussed further below, there is no evidence that Mr. Pepe knew the gun was loaded and this supports the conclusion that Mr. Pepe was not in control of Mr. Lewis.

A comparison of Mr. Pepe and Mr. Lewis's criminal histories also supports a conclusion that Mr. Pepe did not control Mr. Lewis during this conspiracy. At the time of the offense, Mr. Pepe had no prior convictions and was pending trial for a charge of misdemeanor assault, without a weapon, against a prior girlfriend. J.A. at 536. Mr. Lewis, who was two years older than Mr. Pepe, had two prior convictions for theft, both of which had originally been charged as burglaries. J.A. at 277-78; 623-26. In addition, Mr. Lewis had been identified by witnesses at an unrelated trial in the District of Maryland as one of several men who had participated in the gang rape of a young woman. J.A. at 277-78. And, while the government emphasized Mr. Pepe's relationships with known members of the Bloods gang in Howard County, evidence introduced by the government demonstrated that Mr. Lewis had relationships with these men as well. J. A. at 604-17.

Lastly, the Agreed Upon Statement of Facts submitted in support of Desmick Lewis' guilty plea in the Circuit Court for Howard County solidifies the conclusion that Mr. Pepe did not control Mr. Lewis' actions during the course of this conspiracy. The

35

statement is devoid of any suggestion that Mr. Pepe had a leadership role over Mr. Lewis aside from the fact that Mr. Lewis retrieved the gun used in the robbery, "[u]pon Pepe's request." J.A. at 577. Instead, the statement, which was negotiated by counsel for Mr. Lewis, describes a conspiracy in which four people "all planned and conspired to lure Rusty Rowe to Sewall Avenue to rob him." J.A. at 580. The statement concludes by saying that Mr. Lewis, "leaned into Rusty's truck, placed the revolver against Rusty's head. Rusty reacted by trying to push or swat the gun away and [Mr. Lewis] fired several gunshots. Those gunshots killed Rusty Rowe." J.A. at 580.

Given the relative histories of these men, their friendship, and their respective actions on the night of the offense, there is no basis to conclude that Mr. Pepe controlled Mr. Lewis. In assessing relative culpability, which is the "animating purpose" of the role enhancement, Mr. Pepe is not the more culpable party. *United States v. McGregor*, 11 F.3d 1133, 1139 (2nd Cir. 1993).

**2. Mr. Pepe did not control Ms. McAdoo and Ms. Maready.**

The district court's conclusion that Mr. Pepe "exercised a dominant position with regard to Lauren Maready and Miss McAdoo," is also clearly erroneous. J.A. at 418. While it is certainly possible that Mr. Pepe exercised a dominant position in his personal relationship with Ms. McAdoo, it does not follow that he controlled her actions during the course of this conspiracy. *See United States v. Gotti*, 459 F. 3d 296, 348-49 (2nd Cir. 2006) (agreeing that it does not automatically follow that because someone is the boss

36

of a crime family that he's responsible for a role enhancement in every incident of relevant conduct taken as part of a criminal enterprise). In fact, the record is replete with evidence that Ms. McAdoo was very much in control of her own actions during this conspiracy.

Ms. McAdoo had an admitted history of trying to get drugs for free, ripping off drug dealers, and at least contemplating, if not committing, robberies. J.A. at 140-42, 250, 263, 603. As the government acknowledges, the conspiracy began with Ms. McAdoo; it was her idea to reach out to Russell Rowe to get drugs that she knew she did not have the money to purchase. J.A. at 30. According to both Ms. Maready and Ms. McAdoo, they were full and willing participants in all of the conversations regarding the robbery. Despite the fact that both Ms. McAdoo and Ms. Maready had every incentive to provide as much harmful testimony as possible against Mr. Pepe, neither girl ever testified that the robbery was Mr. Pepe's idea, instead they testified that Ms. McAdoo initiated the plan to get drugs for free from Mr. Rowe, and at some point this plan evolved into a plan to rob him.

Ms. McAdoo took an active role in that plan as it unfolded. Ms. McAdoo testified that she came up with "a lot of good ideas" that day. J.A. at 253. For example, she chose the meeting place and she came up with the idea of approaching Mr. Rowe's car while smoking a cigarette so that she would have an excuse to stay outside the car and out of the way when Mr. Lewis came up to carry out the robbery.

37

J.A. at 113.   In addition, it was Ms. McAdoo's idea to slam the car door shut to signal to Mr. Lewis that Mr. Rowe had arrived on the scene, and it was Ms. McAdoo who told Mr. Lewis where to walk when he got out of the car.   J.A. at 117.

Moreover, Ms. McAdoo told Mr. Pepe where to go after Mr. Lewis left the car – ordering him to hide in the back seat so Mr. Rowe would not see him. J.A. at 154-55. In addition, Ms. McAdoo was confident enough in her role in the conspiracy to insist that the gun remain unloaded.   J.A. at 254.   It is hard to imagine that an abusive boyfriend who was controlling his girlfriend's actions while planning for a robbery would have calmly accepted direction from that girlfriend regarding whether or not the gun to be used in the robbery should be loaded.

As for Ms. Maready, it certainly appears as if she was the least active of the four co-conspirators that night.   However, aside from yelling at her to drive away from the scene once he saw Mr. Lewis fire the gun, there is no evidence of Mr. Pepe controlling Ms. Maready either.   In fact, Ms. McAdoo was the reason Ms. Maready was involved in the conspiracy; the two were best friends, with Ms. Maready appearing to function as Ms. McAdoo's driver.   J.A. at 78.   And, Ms. Maready had her own history trying to get drugs for free and her own history with Russell Rowe.   J.A. at 94, 141.   This Court can observe the demeanor of these two co-conspirators in pictures they took of themselves the day after the robbery. J.A. at 570-72.   These pictures paint a very different picture of the dominated and controlled conspirators than the district court

38

imagined.

In sum, Ms. McAdoo was fully in control of her actions and her decisions during the course of the conspiracy and if Ms. Maready was being controlled by anyone, it was Ms. McAdoo, not by Mr. Pepe.   Mr. Pepe did not have a greater "relative responsibility" than Ms. McAdoo.   *McGregor*, 11 F. 3d at 1139. Nor did Mr. Pepe have a greater "relative responsibility" than Desmick Lewis.   For these reasons, the district court erred in applying the role adjustment and the district court may not apply it upon resentencing.

## III.   The District Court erred in applying the first-degree murder cross-reference.

Mr. Pepe was convicted of conspiracy to commit Hobbs Act robbery, an offense for which the applicable guideline would typically be found in §2B3.1 of the sentencing guidelines.   However, because Russell Rowe was killed during the course of the robbery that was the object of the conspiracy, the government argued that the cross-reference found in §2B3.1(c) should apply.   This cross-reference states that "if a victim was killed under circumstances that would constitute murder under 18 U.S.C. §1111, had such killing taken place within the territorial or maritime jurisdiction of the United States, apply the first-degree murder guideline found at U.S.S.G. §2A1.1."   U.S.S.G. §2B3.1(c).

Section 1111 of Title 18 defines murder as "the unlawful killing of a human being with malice aforethought."   The statute states further that: "Every murder

39

perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any . . . robbery . . ." is murder in the first degree. 18 U.S.C. §1111(a).   This final clause of subsection 1111(a) is referred to as the felony murder provision.   *See United States v. Williams*, 342 F.3d 350, 356 (4th Cir. 2003), quoting 18 U.S.C. §1111 ("the evidence is clear that the murder was 'committed in perpetration of' the robbery, and thus that Williams committed felony murder.").

All forms of first-degree murder, including felony-murder, require a showing of malice aforethought. *See Williams*, 342 F.3d at 356.   The fact that a person was killed in the perpetration of a robbery, for example, does not in itself demonstrate the presence of malice.   *See id.*   Rather, "[w]hether malice is present in a given case 'must be inferred by the jury from the whole facts and circumstances surrounding the killing.'" *Id.*, quoting, *United States v. Fleming*, 739 F. 2d 945, 947 (4th Cir. 1984).

The facts and circumstances surrounding the killing of Russell Rowe do not support a finding that Mr. Pepe acted with malice aforethought.   There is affirmative evidence that at least two of the four members of the conspiracy believed the gun used in the robbery was going to be unloaded and there is no evidence to suggest that Mr. Pepe believed otherwise.   Conspiring to commit a robbery by pistol-whipping someone with an unloaded firearm does not demonstrate the malice aforethought required to apply the murder cross-reference.

40

### A.    The district court's conclusion that Mr. Pepe knew the gun was loaded is clearly erroneous.

At sentencing, the district court instructed the parties to present it with evidence and argument regarding the role adjustment and the cross-reference at the same time. J.A. at 404-05.   The court did this because it reasoned that if it concluded that Mr. Pepe was a leader or organizer, then it could impute knowledge that the gun was loaded to Mr. Pepe, which was relevant to its application of the cross-reference. *Id.* Specifically, the court stated,

> . . . I think one of the Court's inquiries is going to be if I find that Mr. Pepe was an organizer or leader of this enterprise, at least over the two young ladies . . . and potentially over Mr. Lewis, then can I impute some knowledge into the loading of that firearm to the leader of the criminal enterprise or the conspiracy?
>
> So of course, if he was not a leader, then I could not factor that in. But of course, if I find that he was a leader or an organizer in the conspiracy, then I believe based upon the testimony that I received from Ms. McAdoo and Lauren Maready in the post-shooting behavior of the defendant, that could suggest, at least circumstantially, that he knew that the gun was loaded, they had the opportunity to observe the gun being loaded, and therefore the cross-reference would apply, because he would have had awareness and a serious risk of death of (*sic*) bodily harm.
>
> . . . I'm thinking that the two are so intertwined that it may be better for me to consider all of those factors, and maybe that's why I should have started with role.

*Id.*   After hearing argument on the role adjustment, the court concluded that, "the defendant's location in the back of the vehicle [and] his role in the conspiracy," all support the evidence that the defendant was aware that the gun was loaded.   J.A. at

41

419.

As discussed above, the court's logic relies on an unreasonable degree of bootstrapping and ignores the equally valid conclusion that the absence of direct evidence that Mr. Pepe knew the gun was loaded demonstrates that he was not acting in a leader/organizer capacity. Setting aside this faulty interference, the conclusion that Mr. Pepe knew the gun was loaded is clearly erroneous given the evidence in the record.

First, the agreed upon statement of facts says nothing about whether or not the firearm was loaded; it says only that "[a]t some point inside the house, Lewis went to another area of the house and returned with a revolver." J.A. at 31. The house that Mr. Lewis retrieved the gun from was his own house, and the area of the house that Mr. Lewis retrieved the gun from was his own bedroom. J.A. at 259. Amanda McAdoo testified that she recalled having seen Mr. Lewis with that gun previously, and witness Christopher Morris testified that the only gun he had ever seen Mr. Pepe with was a silver handgun, not the black .38 revolver that Mr. Lewis used to kill Russell Rowe. J.A. at 176.

In addition, Lauren Maready and Amanda McAdoo both believed the revolver was unloaded. J.A. at 159, 254. In fact, Mr. Pepe and Mr. Lewis told Ms. McAdoo that the gun was not loaded and in response, she told them that the gun should remain unloaded. J.A. at 254. As a result, Ms. McAdoo was shocked when she heard Mr. Lewis fire the gun. *Id.* According to Ms. Maready, Mr. Pepe was also in shock after

42

the shooting.   J.A. at 163.   In fact, all three of the co-conspirators were angry with Mr. Lewis. *Id.*   This response is not consistent with Mr. Pepe having secretly conspired with Mr. Lewis to place bullets in the revolver before the robbery.

Moreover, no evidence was introduced demonstrating when the bullets were placed in the gun.   That Mr. Pepe and Mr. Lewis sat in the back seat of Ms. Maready's car on the way to meet Russell Rowe is not evidence that Mr. Pepe saw Mr. Lewis place bullets in the gun.   J.A. at 419.   While this may be what the district court imagined happened, such imaginings do not equate to evidence.   On the other hand, there is strong circumstantial evidence that Mr. Lewis himself loaded the gun.   While sitting with Mr. Lewis in the car after the robbery, Ms. Maready observed him counting the bullets remaining in the gun and heard him say that he, "had knocked four off."   J. A. at 122.

Given all of this evidence, it was clearly erroneous for the district court to have concluded that Mr. Pepe knew the gun was loaded.   This conclusion holds true even if this Court agrees that Mr. Pepe was a leader or organizer of the conspiracy; the record does not support a factual conclusion that Mr. Pepe knew the gun was loaded prior to seeing Mr. Lewis fire it.

### B.   Without knowledge that the gun was loaded, Mr. Pepe did not possess the malice aforethought needed to apply the murder cross-reference.

After concluding, erroneously, that Mr. Pepe knew the gun was loaded, the

43

district court went on to conclude that even if Mr. Pepe did not know the gun was loaded, he knew, "that Mr. Lewis was going to use the weapon at the very least to inflict bodily harm on the defendant . . . by pistol-whipping him." J.A. at 419. The court found that pistol-whipping can result in someone being killed, "depending on the location and the strength of the blows." J.A. at 420. Moreover, the court concluded that even if Mr. Pepe was not aware that there would be a pistol-whipping, or even if pistol-whipping did not create a serious risk of death or bodily injury, "knowingly having Mr. Lewis carry a firearm to commit a robbery in and of itself creates a serious risk of death or bodily harm." *Id.* These conclusions are not supported by the law, and this Court, applying a *de novo* standard of review, should reject them.

"Malice aforethought may be established by evidence of conduct which is reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a [factfinder] is warranted in inferring that [the] defendant was aware of a serious risk of death or serious bodily harm." *United States v. Ashford*, 718 F.3d 377, 384 (4th Cir. 2013). "A district court may infer malice when a defendant uses a weapon 'in such a manner as may be expected naturally and probably to cause death.'" *United States v. Slager*, 912 F.3d 224, 235-36 (4th Cir. 2018) (concluding that repeatedly discharging a firearm at the victim while he attempted to run away "may be expected naturally and probably to cause death"), citing, *United States v. Celestine*, 510 F.2d 457, 459 (9th Cir. 1975); *United States v. Wright*, 594 F. 3d 259, 269 (4th Cir. 2010) (finding malice when

44

Defendant "engaged in a 'reckless firing of the firearm, a random firing *with the intent to hurt someone,'*" emphasis in original; *Ashford*, 718 F. 3d at 384 (finding malice when Defendant "drew his firearm and pursued the fleeing" victim).

When analyzing malice in the context of a robbery resulting in a killing, this Court looks to a variety of surrounding factors to determine whether there was a sufficient showing of malice to constitute murder. For example, in *United States v. Williams*, on the way to the robbery, one of the co-conspirators said that if the men robbed the target, they would have to kill him. 342 F.3d at 356. In addition, before the robbery, one co-conspirator gave the defendant a gun and told him to shoot the victim if he "act[ed] up." *Id.* This statement led this Court to conclude that the defendant was "obviously" aware of the possibility that robbing the victim might also entail killing him. *Id.* During the robbery itself, the defendant shot the victim in the leg, then handed the gun to a co-conspirator, who shot him again. *Id.* Together, this evidence convinced this Court that the defendant was aware of the risk of death or serious bodily harm as he actively participated in the robbery. *Id. See also, United States v. Godette*, 596 Fed. Appx. 212 (4th Cir. 2015) (firing a gun at the victim's house during an attempted robbery sufficed to apply the attempted first-degree murder cross-reference).

Similarly, in *United States v. Chaney*, this Court concluded that the choice to conspire with others to rob the victim and to enter the victim's residence "with a loaded

45

gun" warranted the district court in inferring that the defendant was aware of a serious risk of death or serious bodily harm." 493 Fed. Appx. 448, 452-53 (4th Cir. 2012). In so holding, this Court cited to the district court's own explanation for why the defendant's conduct rose to the level of malice aforethought:

> I think the only possible conclusion that anybody with any reason and common sense could reach from all the testimony, is that the defendant Chaney … went into that house with a loaded pistol to commit robbery, and that it – nobody with any kind of intelligence or any kind of – I mean, a first grader would almost realize that if you … went into a person's house at night with a loaded gun to rob him, it's the only reasonable conclusion, … that any person could reach but that Mr. Chaney knew that a serious risk of harm, based on that type of reckless conduct and wanton reckless conduct, that there was a serious [risk] – he knew that, had to know that. No way he could not know that.

*Id.*

On the other hand, a review of federal caselaw does not reveal cases in which a court applied the murder or attempted murder cross-reference based on a robbery committed with an unloaded firearm  Moreover, the one case in which a court applied the cross-reference where a pistol-whipping resulted in death involved a gun that the defendant knew was loaded and that discharged during the pistol-whipping, resulting in a bullet going into the victim's head. *See United States v. McClellan*, 436 Fed.Appx. 479 (6th Cir. 2009).

The absence of comparable cases makes sense because using an unloaded firearm to commit a robbery does not carry the same risk of bodily injury or death that

46

carrying a loaded firearm does and thus there are likely few, if any, cases in which such conduct resulted in death. Even if some small number of cases exist, this does not mean that a defendant is "obviously" aware that when he uses an unloaded firearm to threaten or even pistol-whip someone death or serious bodily injury is *likely* to occur. *Williams*, 342 F.3d at 356.

Statistically speaking, it isn't, despite the district court's unfounded claim that "people have been killed by being pistol-whipped, easily killed." J.A. at 419. It is very difficult to find data on injuries or death resulting from the use of an unloaded firearm in the commission of another offense, or data on death or injuries resulting from pistol whipping. One report that is almost twenty years old reveals that over a four-year period, 36,980 people were treated in emergency rooms across the United States for injuries sustained as a result of a non-shooting assault with a firearm. *See* Hootman, J.M. et. al, *National estimates of non-fatal firearm related injuries other than gunshot wounds*, 6 Injury Prevention 268 at 269-70 (2000). Of those, 95% were treated and released from the hospital, only 4.2% were even admitted. *Id.* at 270.

While the plan to rob Russell Rowe was unlawful, dangerous, and callous, Mr. Pepe's participation in that plan did not involve the degree of malice required for him to be held responsible for Mr. Rowe's murder through the application of the cross-reference. It is clear that Desmick Lewis acted with malice when he loaded the

47

revolver, pointed it at Mr. Rowe's head and fired it several times.   However, this Court cannot conclude that the manner in which Mr. Pepe believed the weapon would be used "may be expected naturally and probably to cause death.'" *Slager*, 912 F.3d at 235-36. Upon resentencing in the district court, the cross-reference should not apply.

## CONCLUSION

The parties agree that Mr. Pepe's conviction under 18 U.S.C. § 924(c) for use of a firearm during and in relation to a "crime of violence" must be vacated.   Upon resentencing under the sentencing package doctrine, Mr. Pepe should be sentenced without an upward adjustment for his role in the offense and without a cross-reference to the first-degree murder guideline.

Respectfully submitted,

JAMES WYDA
Federal Public Defender
 /S/

JOANNA SILVER
PARESH PATEL
Assistant Federal Public Defenders
3411 Ivy Lane
Greenbelt, Maryland 20770

Counsel for Appellant

48

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for Appellant respectfully requests oral argument so that all of the issues above can be more fully presented for the Court's consideration.


/S/ Joanna Silver

JOANNA SILVER
Assistant Federal Public Defender

49

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH LIMITATIONS

TO BE INCLUDED IMMEDIATELY BEFORE THE CERTIFICATE OF SERVICE FOR ALL BRIEFS FILED IN THIS COURT.

1.    This brief has been prepared using (SELECT AND COMPLETE ONLY ONE):

___X___ Fourteen point, proportionally spaced, serif typeface (such as CG Times or Times New Roman, NOT sans serif typeface such as Arial).   Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, CG Times, 14 point)

_____ Twelve point, monospaced typeface (such as Courier or Courier New).   Specify software name and version, typeface name, and pint size below (for example, WordPerfect 8, Courier, 12 point):   Microsoft Word, Courier New, 12 point.

2.    EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules or regulations, and the certificate of service, the brief contains (SELECT AND COMPLETE ONLY ONE):

_____ Pages (give specific number of pages; may not exceed 30 pages for opening or answering a brief of 15 pages for reply brief); OR

12,843 Words (give specific number of words; may not exceed 14,000 words for opening or answering brief or 7,000 for reply brief); OR

_____ Lines of Monospaced Type (give specific number of lines; may not exceed 1,300 lines for opening or answering brief or 650 for reply brief; may be used ONLY for briefs prepared in monospaced type such as Courier or Courier New).

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.   If the Court so directs, I will provide an electronic version of the brief and/or a copy of the work or line print-out.

/S/
Signature of Filing Party

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of December, 2019, I electronically filed the foregoing Brief of Appellant with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user: Sandra Wilkinson, Assistant United States Attorneys, Office of the United States Attorney, 36 South Charles Street, 4th Floor, Baltimore, Maryland 21201.


/S/
JOANNA SILVER
Assistant Federal Public Defender